FILED
2013 Jun-12  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ROBERT A. CHANCEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:11-CV-3609-VEH |
| | ) |
| FAIRFIELD SOUTHERN CO., INC. | ) |
| and UNITED STATES STEEL | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

### A.    Summary of Mr. Chancey's Claims

Plaintiff Robert A. Chancey ("Mr. Chancey") initiated this job discrimination

lawsuit against Defendants Fairfield Southern Co., Inc. ("Fairfield") and United

States Steel Corporation ("USS") arising under the Americans with Disabilities Act

(the "ADA"), as amended in 2008 (the "ADAA"),[1] on October 11, 2011.  (Doc. 1).

---

[1]  Based upon the absence of any briefing on the issue, evidently there is no disagreement that the ADAA applies to this lawsuit.  The parties' apparent stipulation over which law to apply is also consistent with the court's prior ADAA retroactivity analysis as the alleged discriminatory conduct that Mr. Chancey complains about took place after January 1, 2009.  This court has previously concluded that in the context of a plaintiff, such as Mr. Chancy, who seeks monetary damages for disability

While Mr. Chancey's complaint lists four separate counts (Doc. 1 at 5-8 ¶¶ 28-38),[2] many of the allegations and claims contained in the pleading appear to the court to overlap and, thus, are due to be consolidated in the manner further explained below. Count one contends that Defendants violated the ADAA and discriminated against Mr. Chancey "by subjecting him to unjustifiable medical evaluations and refusing to allow him to return to his job before and after he was released to return to work …." (Doc. 1 at 5-6 ¶ 29).

Count two asserts that "Defendants violated the ADA[A] by utilizing standards, criteria, or methods of discrimination that have the effect of discrimination on the basis of disability." (*Id.* at 7 ¶ 34). Count three maintains that "Defendants violated the ADA[A] by utilizing qualification standards, employment tests or other selection criteria that screen out or tend to screen out individuals with disabilities." (*Id.* at 7 ¶ 36). Finally, count four alleges that "Defendants violated the ADA[A] by

discrimination premised upon an adverse employment action that occurred <u>prior</u> to January 1, 2009, the [ADAA] should <u>not</u> be applied retroactively. *See generally Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1269-72 (N.D. Ala. 2009) (analyzing whether to apply ADAA retroactively to challenged conduct pre-dating January 1, 2009). Relying upon *Richardson* as persuasive authority and applying its retroactivity ruling conversely to the discriminatory time frame implicated here, the court will analyze the Motion and Mr. Chancey's disability claims under the ADAA.

[2]   The page references to Doc. 1 correspond with the court's CM/ECF numbering system.

subjecting the Plaintiff to a medical examination which required the Plaintiff to answer questions about his service-related disability, including the nature and severity of his disability and the examination cannot be shown to be job-related and consistent with business necessity." (Doc. 1 at 7-8 ¶ 38).

In sum, having considered all of Mr. Chancey's allegations, the court concludes that a reasonable reading of his complaint clarifies that he is really only asserting two separate claims against Defendants under the ADAA – one for disability discrimination and the other for a violation of the medical evaluation provisions. Further, the court's summary of the claims contained in Mr. Chancey's complaint is consistent with the parties' briefing on summary judgment.

### B.    Summary of Pending Motions

Pending before the court are Fairfield's Motion for Summary Judgment (Doc. 26) ("Fairfield's Motion") and USS's Motion for Summary Judgment (Doc. 24) ("USS's Motion"), both of which were filed on November 30, 2012.  Fairfield and USS filed all their supporting materials on this same date.  (Docs. 25, 27, 30).

Fairfield and USS also jointly filed two motions in limine on November 30, 2012:  Defendants' Motion in Limine To Exclude any Opinion or Testimony by Amanda Hood ("Ms. Hood") that Plaintiff Could Return to Work (Doc. 28) (the "Hood Strike Motion") and Defendants' Motion in Limine To Exclude any Opinion

or Testimony by Dr. Andrea Thomas ("Dr. Thomas") that Plaintiff Could Return to Work (Doc. 29) (the "Thomas Strike Motion").

Mr. Chancey filed his opposing materials on December 21, 2012. (Docs. 35-40, 42). Fairfield and USS followed with their reply briefs on January 4, 2013. (Docs. 46-49). Finally, on April 18, 2013, the court granted Mr. Chancey's request (Doc. 52) to file a notice of supplemental case authority consisting of one published decision issued by the Eleventh Circuit.

Accordingly, Fairfield's Motion, USS's Motion, the Hood Strike Motion, and the Thomas Strike Motion are now all under submission. For the reasons explained below, Fairfield's Motion is due to be granted in part and denied in part, USS's Motion is due to be granted in part and denied in part, the Hood Strike Motion is due to be termed as moot, and the Thomas Strike Motion is due to be termed as moot.

## II.   FACTUAL BACKGROUND

Mr. Chancey was hired on or about December 2, 2009, as a train operator helper for Fairfield.[3] The job description for train operators and helpers provides for

_____

[3] Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*,

4

the following mental requisites:

> Alert[.]
> Able to work with other men as unit.
> Sense of safety and responsibility for himself and others.
> Able to plan work and act independent of supervisor.
> Able to give and relay signals from ground, on ladder and from side of cars.
> Write legibly and read.
> High degree of responsibility for the safety of the public and other employees as well as property.

(Doc. 30-9 at 14).[4]

The description also lists fifteen physical requirements:

> Good distant and near vision.
> Good color vision.
> Good hearing.
> Agility.
> Capable of boarding and alighting from moving cars and engines.
> Ascend and descend vertical ladders on cars and engines in motion.
> Able to do lifting.
> Able to throw switches (about 60 lbs.).
> Able to pull pins and disconnect air hoses.
> Able to operate hand brakes on top of cars.
> Able to be on feet most of time of duty.
> Able to walk briskly on railroad roadbed for a distance of one to two miles regardless of weather conditions.

---

487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.  Finally, due to the nature of this court's decision on summary judgment, the foregoing statement of facts is significantly limited in scope.

   [4]  The page references to Doc. 30-9 correspond with the court's CM/ECF numbering system.

Able to work irregular hours.
Able to work at night with no more than a hand lantern.
Able to open and close doors on rail cars with and without hand tools.

(Doc. 30-9 at 14).

In this suit, Mr. Chancey claims that Fairfield and USS discriminated against him in violation of the ADAA when, on July 8, 2010, he was instructed to contact Employee Assistance Services ("EAS") to arrange for a psychological evaluation and to refrain from reporting to work. Mr. Chancey further complains that, after being referred to Grayson & Associates and treated for Post Traumatic Stress Disorder ("PTSD") at that facility, based upon the opinion of Dr. Cheryl Szabo ("Dr. Szabo"), the Medical Director at USS, he has never been permitted to return to his previously held position of train operator helper, despite being released by Grayson & Associates to return to work.

More specifically, as Dr. Szabo testified regarding her return to work examination of Mr. Chancey conducted on November 1, 2010:

Q.   Okay.  So was it your suggestion that he be restricted from working around trains?

A.   Working around moving trains and mobile equipment.

Q.   What kind of trains are there?  Have the got trains out there that don't move?

A.   Yes.

6

Q.      How is that?

A.      If they're in maintenance or something like that.

Q.      So he could work around the train so long as it wasn't moving, but if it was moving, you had safety concerns?

A.      I do. . . .

Q.      So was your concern the medications he was taking?

A.      In part.

Q.      Well, tell me.

A.      He wasn't clinically ready to go back to work without restrictions.

Q.      What about that?

A.      He was shaking, tremulous, stuttering.  He had no eye contact. He looked depressed.  I did some coordination tests on him, and he could not do or follow instructions on coordination tests.   He couldn't do a finger-to-nose test. . . .

Q.      I'm talking about -- I should say, what did you associate those symptoms to?

A.      His disease.

Q.      What disease?

A.      Posttraumatic stress disorder.

Q.      Was one of your concerns also the medication he was taking?

A.      That's an additional concern.

(Doc. 31-11 at 40 at 154-56).[5]

On July 23, 2010, Mr. Chancey applied for disability compensation from the Department of Veterans Affairs (the "VA").  (Doc. 31-1 at 51-57).[6]  Mr. Chancey's listed tremors (occurring in his upper extremities) and PTSD as his service-connected disabling conditions in support of his VA disability application. (*Id.* at 51, 57).

On March 14, 2011, the VA rendered a "Rating Decision" finding Mr. Chancey to be entitled to 50% in VA compensation benefits effective July 26, 2010, due to PTSD.  (Doc. 31 at 2, 6).[7]  As explained in the VA's Rating Decision:

> An evaluation of 50 percent is assigned from July 26, 2010, the date of claim.  An evaluation of 50 percent is assigned for occupational and social impairment with reduced reliability and productivity due to such symptoms as:  flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material; forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintain effective work and social relationships.

(Doc. 31-1 at 15).

---

[5]   The initial page reference to Doc. 30-11 corresponds with the court's CM/ECF numbering system.

[6]   The page references to Doc. 31-1 correspond with the court's CM/ECF numbering system.

[7]   The page references to Doc. 31 correspond with the court's CM/ECF numbering system.

Mr. Chancey filed his initial EEOC charge asserting disability discrimination under the ADAA against USS on November 11, 2010. (Doc. 1 at 10-11). During the pendency of the EEOC's investigation, Mr. Chancey filed an amended charge on June 28, 2011, expressly naming both USS and Fairfield as respondents. (*Id.* at 12-13).

## III.   STANDARDS

### A.   Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no

genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## B.    Disability Discrimination

Regarding establishment of a *prima facie* case of disability discrimination under the ADA, the Eleventh Circuit has explained:

> The ADA mandates that employers shall not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims. *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996). Thus, Hilburn has the burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence, which requires a demonstration that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability. 42 U.S.C. §§ 12112(a); *see Morisky v. Broward County*, 80 F.3d 445, 447-49 (11th Cir.1996). Having concluded that Hilburn had not established any genuine issue of a material fact relating to the first *prima facie* factor of disability, the trial court did not address the last two factors. *See Hilburn*, 17 F. Supp. 2d at 1383. Therefore, we will limit our discussion to whether Hilburn can be considered disabled within the meaning of the ADA.
>
> The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Additionally, Hilburn must establish that Murata had actual or

constructive knowledge of the disability or considered her to be disabled. *Morisky*, 80 F.3d at 448.

The ADA defines a "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.  42 U.S.C. § 12102(2).

Hilburn must be deemed to be "disabled" for purposes of the ADA if she satisfies any one of these three definitions. However, a physical impairment alone is not necessarily a disability under the ADA. *Pritchard*, 92 F.3d at 1132.  Commentary to the federal regulations contains a non-exclusive list of conditions that constitute a physical impairment.  For the purposes of Hilburn's personal disability claim, it is significant that heart disease is included in this listing. 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997). Courts, including the Eleventh Circuit Court of Appeals (Eleventh Circuit), frequently look to EEOC regulations to assess the next analytical step of determining whether a physical impairment substantially limits a major life activity. *See, e.g., Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

These regulations explain that the term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. §§ 1630.2(j)(1)(I), (ii) (1997).  Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I) (1997).  With respect to the major life

activity of working, the regulations explain that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I) (1997).

*Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226-27 (11th Cir. 1999)

(footnote omitted)  (emphasis added).

The ADAA broadens coverage under the ADA and provides in part that:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(I)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as–

> **(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

12

**(II)** use of assistive technology;

**(III)** reasonable accommodations or auxiliary aids or services; or

**(IV)** learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(A)-(E)(I).

The last stated purpose of the ADAA calls for a broadening of the term "substantially limits":

**(6)** to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly restricted' to be consistent with this Act, including the amendments made by this Act.

Pub. L. No. 110-325, 122 Stat. 3553, 3554 § 2(b)(6) (2008).

## C.    Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard." *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).  "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment."  *United States v. Estelan*, 156 Fed. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect

13

evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* Fed. R. Evid. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry*, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee an appealing party relief from an adverse final judgment. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" in order for reversible error to occur.

## IV. ANALYSIS

### A. Fairfield's Motion

Fairfield's Motion has two parts. Fairfield initially argues that Mr. Chancey's ADAA claims are barred by the affirmative defense of administrative exhaustion. Alternatively, Fairfield maintains that Mr. Chancey's ADAA claims are flawed for additional reasons.

### 1.    Fairfield's Administrative Exhaustion Argument

Fairfield asserts that Mr. Chancey is administratively barred from pursuing his ADAA claims against it because the only timely filed charge of discrimination names USS as the sole respondent.  (Doc. 1 at 10).  "This filing requirement provides notice to the party charged with a violation and gives that party an opportunity to comply with Title VII before the institution of an action in federal court."  *Davis v. Weidner*, 596 F.2d 726, 729 (7th Cir. 1979).

As the Eleventh Circuit has explained the EEOC timely charge requirement:

> Timely filing a charge of discrimination is a prerequisite to bringing suit under both Title VII and the ADA.  *See* Section 706(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e) (1994); 42 U.S.C. § 12117(a); *Love v. Pullman Co.*, 404 U.S. 522, 523, 92 S. Ct. 616, 30 L. Ed. 2d 679 (1972) ("A person claiming to be aggrieved by a violation of Title VII of the Civil Rights Act of 1964 ... may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues of potential administrative relief."); *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir.1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964.").  An ADA plaintiff has the burden of proving all conditions precedent to filing suit, including the condition that he timely filed with the EEOC.  *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1011 (11th Cir. 1982) ("[T]he timely filing of an EEOC complaint is a condition precedent to a Title VII action").

> Ordinarily, an ADA plaintiff must file a charge complaining about an allegedly unlawful employment practice (the "charge") with the EEOC within 180 days of the employment practice, *see* 42 U.S.C. § 2000e-5(e)(1) (1994), . . . .

*Maynard v. Pneumatic Products Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) (emphasis added).

In opposing summary judgment, Mr. Chancey does not dispute that he formally named Fairfield as a separate respondent by way of an amended charge outside of the 180-day period.  (Doc. 42 at 48 ("Although Fairfield Southern's name was not added to Plaintiff's EEOC Charge until June 28, 2011 . . . ."))[8]  Instead, he essentially maintains that the court should equitably excuse this omission because Fairfield, through its senior HR manager, Tom Weideman ("Mr. Weideman"), was "provided with adequate notice of the charge" and "the opportunity to participate in conciliation proceedings" at the administrative level.  (Doc. 42 at 46); (*see also* Doc. 37-11 (letter dated November 23, 2010, from Mr. Chancey's counsel to Mr. Wiedeman, seeking to return Mr. Chancey to work)).

Mr. Chancey further asserts that his amended charge made on June 28, 2011, should relate back to his timely December 2010 charge because the nature of his disability discrimination allegations were unaltered and the addition of Fairfield was merely a technical cure under 29 C.F.R. § 1601.12.  (Doc. 42 at 48-49).  Section 1601.12(b) states:

---

[8]  The page references to Doc. 42 correspond with the court's CM/ECF numbering system.

(b) Notwithstanding the provisions of paragraph (a) of this section, a charge is sufficient when the Commission receives from the person making the charge <u>a written statement sufficiently precise to identify the parties</u>, and to describe generally the action or practices complained of. <u>A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein</u>. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will <u>relate back to the date the charge was first received</u>. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12 (emphasis added).

Fairfield replies that neither equitable principles nor the relation back doctrine should apply as the correspondence from Mr. Chancey's counsel to Mr. Weidman "does not mention [Fairfield] and expressly states that the charge attached [to the correspondence] was 'unfiled.'"  (Doc. 49 at 19).  Fairfield further counters that it "had no opportunity to respond, much less conciliate" with respect to the June 28, 2011, amended charge (*id.*), as the EEOC dismissed all administrative proceedings on July 29, 2011.  (Doc. 1 at 14).

Fairfield does not refute that Mr. Weideman is one of its employees.  Fairfield also overlooks the fact that Mr. Chancey references "Fairfield" in the "NAME" section of his initial charge:  "U.S. Steel Corporation - Fairfield Works".  (Doc. 1 at 10).  This same "Fairfield Works" designation appears in the first "NAME" section of his amended charge.  (*Id.* at 12).  Mr. Chancey also identifies "Fairfield Works"

17

a second time within the body of his initial and amended charge.  (Doc. 1 at 10 ("I was hired December 2, 2009, as a train operator helper at U.S. Steel - Fairfield Works in Birmingham."); *id.* at 12 (same)).

Neither side has directed this court to on-point controlling authority on the issue of whether administrative exhaustion should apply to preclude Mr. Chancey from litigating his ADAA claims against Fairfield.  However, this court has found a pre-*Bonner* decision which it finds to be helpful to the analysis.[9]

In *Tillman v. City of Boaz*, 548 F.2d 592, 593 (5th Cir. 1977), "[t]he issue [wa]s whether Plaintiff complied with the administrative remedy provisions of 42 U.S.C. § 2000e-5 which require a charge to be filed initially with the Equal Employment Opportunity Commission (hereafter the EEOC) against each defendant before proceeding against them in the district court."  "The charge form, when completed and filed, listed 'Mayor Billy B. Dyer (sic) City of Boaz' as the employer(s) who discriminated against [the plaintiff]."  *Tillman*, 548 F.2d at 593.

The *Tillman* court reversed the administrative exhaustion dismissal of the plaintiff's claim against the City explaining that:

> Charges filed with the EEOC must be liberally construed because

_____

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

> they are made by persons who are unfamiliar with the technicalities of formal pleadings and who usually do not have the assistance of an attorney. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970); *Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators of the United States and Canada*, 525 F.2d 1354 (9th Cir. 1975); *Equal Employment Opportunity Commission v. Western Publishing Co., Inc.*, 502 F.2d 599 (8th Cir. 1974). Weight and credibility should be given to the construction or meaning the EEOC gives to charges filed with them. *Macklin v. Spector Freight Systems, Inc.*, 156 U.S. App. D.C. 69, 478 F.2d 979 (1973).
>
> Tillman's letter of March 13, 1975 specifically charges the City with an unlawful employment practice and is incorporated by reference into the charge form. The EEOC investigated the City and the Mayor. Thus, it is sufficiently clear from these documents that the charge was made against both the Mayor, acting as a city official, and the City. Further, the reinstatement requested by Tillman could only be granted by the City as her employer.

*Tillman*, 548 F.2d at 594 (footnote omitted) (emphasis added).

While *Tillman* admittedly is not squarely applicable here, the court finds it to be sufficiently similar such that the opinion provides persuasive support for permitting Mr. Chancey to proceed against Fairfield under a liberal construction of his initial charge which referred multiple times to "Fairfield Works" and the EEOC's subsequent investigation into the merits of those claims, which caused Mr. Chancey to file his amended charge. (*See* Doc. 42 at 4 ("In June 2011, when the EEOC determined that [Fairfield] was actually Plaintiff's employer, the original charge was amended to name [Fairfield] in addition to USS.")).

19

The court's conclusion is further bolstered by the undisputed fact that Mr. Weideman, who received the written correspondence from Mr. Chancey's lawyer, is an employee of Fairfield and, thus, Fairfield had informal notice of Mr. Chancey's intent to challenge as discriminatory the refusal to return him to employment. *Cf. Terrell v. U. S. Pipe & Foundry Co.*, 644 F.2d 1112, 1124 (5th Cir. 1981) ("Applying these precedents and principles favoring liberality to the facts now before us, we must nevertheless conclude that the Internationals were insufficiently implicated in the discrimination alleged in appellants' original charges to have reasonably triggered EEOC investigation of the Internationals."), *cert. granted on other grounds and judgment vacated by International Molders and Allied Workers Union AFL-CIO Local 342 v. Terrell*, 456 U.S. 968, 102 S. Ct. 2229, 72 L. Ed. 2d 841 (1982).

The court alternatively and additionally holds that the amended charge which separately names Fairfield (in addition to USS) constitutes a technical cure within the meaning of 29 C.F.R. § 1601.12 and, thus, relates back to Mr. Chancey's original administrative filing which included several references to "Fairfield Works" as an apparent division of USS. Accordingly, the administrative exhaustion section of Fairfield's Motion is due to be denied.

**2.     Fairfield's   Alternative   Challenges   of   Mr.**

**Chancey's ADAA Claims**

a.       **ADAA Discrimination Claim**

Fairfield challenges Mr. Chancey's *prima facie* ADAA discrimination claim

only as to the qualified individual prong.   (Doc. 27 at 23, 26).

> Determining whether an individual is "qualified" for a job is a
> two-step process. *See* 29 C.F.R. pt. 1630 app. at 352–53.  First, does the
> individual satisfy the prerequisites for the position; does the individual
> have sufficient experience and skills, an adequate educational
> background, or the appropriate licenses for the job? *See id.*  Second, can
> the individual perform the essential functions of the job, either with or
> without reasonable accommodations? *See id.* The plaintiff has the
> burden of proving that reasonable accommodations were available. *See*
> *Holbrook*, 112 F.3d at 1526. Reassignment is only a reasonable
> accommodation if a position for which the plaintiff is qualified is
> available.  *See Willis v. Conopco, Inc.,* 108 F.3d 282, 284 (11th Cir.
> 1997).

*Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000).   Regarding this two-step

inquiry, Fairfield's focus is upon the second part–that Mr. Chancey has not adduced

sufficient evidence upon which a reasonable jury could conclude that he can perform

the essential functions of a train operator helper either with or without reasonable

accommodation.

"'Essential functions' are the fundamental job duties of a position that an

individual with a disability is actually required to perform."   *Earl v. Mervyns, Inc.*,

207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)).  Further,

"consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).

As part of its position, Fairfield maintains that Mr. Chancey should be equitably estopped from asserting that he is a qualified individual under the ADAA due to his actions taken and sworn statements made in furtherance of his partially successful VA disability application.  As legal support, Fairfield relies centrally upon *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S. Ct. 1597,  143 L. Ed. 2d 966 (1999).

In *Cleveland*, a plaintiff pursued a pre-amendment ADA action that arguably conflicted with an earlier SSDI disability claim asserted by that plaintiff under the Social Security Act.  In announcing a suitable framework for evaluating the overlap of such potentially competing statutory tracks to establishing cognizable legal disability, the Supreme Court resisted adopting any "special legal presumption" and instead explained:

> In light of these examples, we would not apply a special legal presumption permitting someone who has applied for, or received, SSDI benefits to bring an ADA suit only in "some limited and highly unusual set of circumstances."

Nonetheless, in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim. Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). An ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"—that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

The lower courts, in somewhat comparable circumstances, have found a similar need for explanation. They have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity. Although these cases for the most part involve purely factual contradictions (as to which we do not necessarily endorse these cases, but leave the law as we found it), we believe that a similar insistence upon explanation is warranted here, where the conflict involves a legal conclusion. When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

23

*Cleveland*, 526 U.S. at 805-07, 119 S. Ct. at 1603-04 (citations omitted) (emphasis added).

In opposing summary judgment, Mr. Chancey implicitly accepts that the Supreme Court's qualified individual holding in *Cleveland* is not necessarily limited to diverging Social Security Act claims, but instead maintains that "there is no inconsistency" because "Defendant has not shown where Plaintiff represented to the VA that he was permanently and totally disabled." (Doc. 42 at 55). The court has studied Mr. Chancey's application and, while it may not expressly state that he is completely unable to work, the obvious implication of its contents is that he is seeking 100% in VA compensation benefits based upon his disabling conditions of PTSD and tremors. (*See* Doc. 31-1 at 57 ("This is a request for consideration of the service connected disabilities that I have listed on my application. (526).")).

Certainly, Mr. Chancey has not offered any evidence to suggest, much less explain, that his intent in filing his VA disability application was to secure only minimal[10] as opposed to full disability benefits.[11]   Mr. Chancey also signed his

_____

[10] *See* http://www.benefits.va.gov/compensation/ ("VA provides compensation to Veterans who are at least 10% disabled because of injuries or diseases that occurred or were aggravated during active military service.") (last accessed on June 10, 2013).

[11]    *See*  http://www.benefits.va.gov/COMPENSATION/types-disability.asp ("The benefit amount is graduated according to the degree of the Veteran's disability

disability application with notice that "[t]he law provides severe penalties . . . for the willful submission of any statement or evidence of a material fact, knowing it to be false, or for the fraudulent acceptance of any payment to which you are not entitled." (Doc. 31-1 at 56).

Finally, the VA Rating Decision discusses how Mr. Chancey's 50% disability rating correlates with certain occupational deficiencies (Doc. 31-1 at 15), and Mr. Chancey has made no effort to reasonably explain why this administrative finding bears no relationship to his ability to perform the essential functions of the train operator helper as delineated in the job description and as clarified by Dr. Szabo, including the essential function of being able to safely work around moving trains in light of his PTSD.  (*See* Doc. 30-11 at 40 at 154-55 ("Q.  So he could work around the train so long as it wasn't moving, but if it was moving, you had safety concerns? A.    I do. . . .)).  Therefore, against this backdrop, the court concludes that Mr. Chancey's VA application appropriately falls into the "or the like" disability category identified by the *Cleveland* Court.  526 U.S. at 807, 119 S. Ct. at 1604.

Further, in the absence of a sufficient explanation from Mr. Chancey about his conflicting position taken under penalty of perjury in the VA disability application

─────────────────

on a scale from 10 percent to 100 percent (in increments of 10 percent).") (last accessed on June 10, 2013).

as well as the resulting 50% disability compensation that he continues to receive from VA based upon his PTSD symptoms, the record lacks proof "to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier [disability] statement, the plaintiff could nonetheless 'perform the essential functions' of h[is] job, with or without 'reasonable accommodation.'" *Cleveland*, 526 U.S. at 807, 119 S. Ct. at 1604; *cf. Kurzweg v. SCP Distributors*, LLC, 424 Fed. App'x 840, 844 (11th Cir. Apr. 21, 2011) (unpublished) ("Kurzweg's explanation for his inconsistent representations does not fall within any of the examples listed in *Cleveland*."); *id.* ("In fact, he claimed he was fully able to do his job on June 9, 2009, stressing that his doctor had released him to return to work without restrictions.") (emphasis added); *id.* ("Kurzweg successfully maintained before the SSA that he was unable to do his past relevant work (*i.e.*, his work at SCP) as of June 9, 2008 due to his disability.").

Accordingly, Mr. Chancey's ADAA discrimination claim fails due to his inability to satisfy the qualified individual prong consistent with the Supreme Court's holding in *Cleveland* as persuasively applied to his application for and award of VA disability benefits that have not been reasonably reconciled with his asserted ability to perform the essential functions of his former job with or without reasonable accommodation. Therefore, the merits portion of Fairfield's Motion is due to be

26

granted on this particular ground.

### b.   ADAA Medical Evaluation Claim

42 U.S.C. § 12112(d) covers medical examinations and inquires under the

ADAA and provides in pertinent part:

> (4) Examinations and inquiry
>
> > (A) Prohibited examinations and inquiries
> >
> > A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).  To prevail on this claim, a plaintiff need not establish

his disabled status under the ADAA as the Eleventh Circuit recently joined other

circuits in concluding "that § 12112(d)(4)[(]A) protects employees who are not

disabled." *Owusu-Ansah v. The Coca-Cola Company*, ___ F.3d ___, No. 11–13663,

2013 WL 1896978, at *4 (11th Cir. May 8, 2013).

In *Owusu-Ansah*, the Eleventh Circuit also clarified the meaning of the

exception to the general rule prohibiting disability-related medical examinations:

> The phrase "job-related and consistent with business necessity" appears not only in § 12112(d)(4)(A) of the ADA, but in §§ 12112(b)(6), 12113(a), and 12113(c) as well. We have said that "job-relatedness is used in analyzing the questions or subject matter

contained in a test or criteria used by an employer" as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision. *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1317 (11th Cir. 2009) (interpreting language in § 12113(a)) (internal quotation marks and alterations omitted).  Because "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), we use the *Allmond* definitions here.

> In *Watson* we held that in "any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity." 177 F.3d at 935.  We explained that "the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." *Id.* Although Mr. Owusu–Ansah was not employed as a police officer engaged in dangerous work, *Watson* provides some guidance for us. *See also Williams*, 303 F.3d at 1290–91 (noting in dicta that an employer could have lawfully required medical examination for employee who was hostile, made threats, and was insubordinate).

*Owusu-Ansah*, 2013 WL 1896978, at *5.

After setting forth this framework, the Eleventh Circuit affirmed the district court's acceptance of the magistrate judge's recommendation to grant summary judgment in favor of Coca–Cola, reasoning:

> Given the information it had about Mr. Owusu–Ansah at the time, Coca–Cola did not violate § 12112(d)(4)(A) by requiring him to undergo a psychiatric/psychological fitness-for-duty evaluation. The evaluation, in our view, was "job-related and consistent with business necessity."

28

The evaluation was "job-related" because an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams*, 303 F.3d at 1290. Ms. Cabral reported that Mr. Owusu–Ansah—in the course of complaining about discrimination and harassment—banged his fist on the table and said in a raised voice that someone was "going to pay for this." When he was deposed, Mr. Owusu–Ansah denied having behaved that way during his meeting with Ms. Cabral, and he now points out that there were no prior incidents showing that he had a propensity for workplace violence. That, however, is not dispositive. Although Coca–Cola apparently never asked Mr. Owusu–Ansah for his version of what happened at the meeting, it did not rely solely on Ms. Cabral's account in ordering the evaluation. Coca–Cola knew that Mr. Owusu–Ansah had refused to speak to Ms. Welsh and Dr. Riddell about his workplace problems. In addition, Dr. McElhaney—the consulting psychologist—expressed "significant concerns" to Coca–Cola about Mr. Owusu–Ansah's emotional and psychological stability, and recommended a psychiatric/psychological fitness-for-duty evaluation.

On this record, we conclude that Coca–Cola had a reasonable, objective concern about Mr. Owusu–Ansah's mental state, which affected job performance and potentially threatened the safety of its other employees. Though Mr. Owusu–Ansah worked from home, he had access to and was required to attend meetings at the Dunwoody call center. *See, e.g., Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) ("We have stated that where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may ... require that the employee undergo a physical examination designed to determine his ability to work."); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir.1999) ("[W]e note that the district's obtaining advice that further examination was needed to determine Sullivan's fitness to work buttresses the district's claim that it had reason to believe Sullivan could not perform some essential aspects of his job.").

For basically the same reasons, the evaluation was also "consistent with business necessity." Though it may not be one of the

<u>traditional canons of statutory construction, common sense is not</u>
<u>irrelevant in construing statutes, and in our view an employer can</u>
<u>lawfully require a psychiatric/psychological fitness-for-duty evaluation</u>
<u>under § 12112(d)(4)(A) if it has information suggesting that an</u>
<u>employee is unstable and may pose a danger to others.</u> *See Conroy*, 333
F.3d at 97 ("[B]usiness necessities may include ensuring that the
workplace is safe and secure."). *See also E.E.O.C. v. AIC Sec.*
*Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir.1995) ("It would seem
that a requirement that employees not pose a significant safety threat in
the workplace would obviously be consistent with business necessity:
a safe workplace is a paradigmatic necessity of operating a business.");
*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119 (11th Cir.1993)
(holding that protecting employees from workplace hazards is a
"business necessity" under Title VII).

*Owusu-Ansah*, 2013 WL 1896978, at *5-6 (footnotes omitted) (emphasis added).

Finally, the Eleventh Circuit rejected Mr. Owusu-Ansah's contention[12] "that

---

[12]   Premised upon EEOC, Notice No. 915.002, *Enforcement Guidance:*
*Disability–Related Inquiries and Medical Examinations of Employees under the*
*Americans with Disabilities Act (ADA)* ¶ 5, 2000 WL 33407181, at *6 (July 27,
2000).  This particular guideline partially provides:

5. When may a disability-related inquiry or medical examination of an
employee be **"job-related and consistent with business necessity"**?

Generally, a disability-related inquiry or medical examination of an
employee may be "job-related and consistent with business necessity"
when an employer ""has a reasonable belief, based on objective
evidence, that: (1) an employee's ability to perform essential job
functions will be impaired by a medical condition; or (2) an employee
will pose a direct threat due to a medical condition."  Disability-related
inquiries and medical examinations that follow up on a request for
reasonable accommodation when the disability or need for
accommodation is not known or obvious also may be job-related and
consistent with business necessity. In addition, periodic medical

Coca–Cola also needed evidence that he was a 'direct threat,' a term defined by the ADA as 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation,'" . . . . *Owusu-Ansah*, 2013 WL 1896978, at *7 (citation omitted).  Instead, the Eleventh Circuit found that the direct threat element only applies when "the employer does not have objective evidence that a medical condition will impair an employee's ability to perform an essential job function" and that because "Coca–Cola had objective evidence[,]" the guideline's alternative prong did not come into play.  *Id.*

In his complaint, Mr. Chancey has asserted a medical examination claim comparable to that of the plaintiff in *Owusu-Ansah*.  However in his opposition brief, Mr. Chancey omits any discussion of this theory and, instead, maintains that Fairfield

---

examinations and other monitoring under specific circumstances may be job-related and consistent with business necessity.

Sometimes this standard may be met when an employer knows about a particular employee's medical condition, has observed performance problems, and reasonably can attribute the problems to the medical condition. An employer also may be given **reliable information** by a credible third party that an employee has a medical condition, or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat. In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

*Id.* (footnotes omitted) (emphasis in original).

31

breached the ADAA's confidentiality provisions related to such personal medical information.

Section 12112(d)(4)(C) mandates that "[i]nformation obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3)." Those referenced privacy limitations expressly provide:

> (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--
>
> > (I) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
> >
> > (ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and
> >
> > (iii) government officials investigating compliance with this chapter shall be provided relevant information on request; and
>
> (C) the results of such examination are used only in accordance with this subchapter.

42 U.S.C. § 12112(d)(3)(B)-(C).

In reply, Fairfield points out that Mr. Chancey "attempts for the first time to convert his claim that he was subjected to unlawful medical exams into a claim that

Dr. Szabo shared his medical information with Weideman." (Doc. 49 at 27).  As the

Eleventh Circuit has explained, Mr. Chancey is procedurally forbidden from doing

this:

> The FMLA authorizes leave "[i]n order to care for the ... parent, of the employee, if such ... parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Hurlbert's complaint, however, provided no notice whatsoever that he believed he was entitled to leave on this basis. Indeed, the only person in the complaint alleged to have a experienced a serious health condition is Hurlbert.  We have previously held that Rule 8(a)'s liberal pleading standard is inapplicable once discovery has commenced, and that "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam). Hurlbert argues that this rule is inapplicable, because his allegations about his mother do not raise a new "claim," and are merely additional facts asserted in support of the interference claim already pled in his complaint. We disagree.  The sole basis for entitlement to FMLA leave pled in Hurlbert's interference claim was his alleged serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D). Thus, the subsequent assertion of an additional, separate statutory basis for entitlement to leave (caring for a parent's serious health condition) effects a fundamental change in the nature of Hurlbert's interference claim. *See id.* at § 2612(a)(1)(C). Having proceeded through discovery without amending (or seeking to amend) his complaint to reflect that fundamental change, Hurlbert was not entitled to raise it in the midst of summary judgment. *See Gilmour*, 382 F.3d at 1315 ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.").

*Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1296-97 (11th Cir.

2006) (emphasis added).

Thus, consistent with the Eleventh Circuit's holding in *Hurlbert*, Mr. Chancey is prohibited from pursuing his too-late-raised breach of medical confidentiality claim. *See also Flintlock Const. Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1228 (11th Cir. 2013) ("This court's precedent foreclosed Well–Come's attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2).").

Furthermore, Mr. Chancey has abandoned his alleged medical examination claim. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep.  Sprinkler*

34

*Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Accordingly, Fairfield's Motion is due to be granted with respect to Mr. Chancey's ADAA medically-related claim(s).

### B.     USS's Motion

USS's Motion also has two sections.  First, USS argues that it cannot be liable to Mr. Chancey under the ADAA because it was never his employer.  Second, USS piggybacks onto Fairfield's Motion and contends that even if USS is appropriately treated as an employer under the ADAA, Mr. Chancey's claims are still not maintainable.

### 1.     Status of USS as a Party Subject to Suit Under the ADAA

The heart of the ADAA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). USS's general status as a covered entity is unchallenged.

However, USS contends that it still cannot be specifically liable to Mr. Chancey for any ADAA violations because the record undisputedly establishes that he was an employee of Fairfield, not USS. (*See* Doc. 25 at 12 ("However, FS and not USS, was Plaintiff's employer.")).[13] In urging this position, USS really asks this court to adopt two separate contentions: (1) "that [implicitly] only a qualified individual's [direct or immediate] employer can violate § 12112 of the ADAA" (Doc. 25 at 10); and (2) that the "application of general principles of the law of agency to undisputed or established facts" confirm that USS lacked the requisite level of control over Mr. Chancey to be his employer. (Doc. 25 at 12).

In interpreting the scope of potential liability under Title VII, the Eleventh Circuit has instructed that "[i]t is clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, 294 (11th Cir. 1988); *id.* ("In finding that the plaintiff had stated a claim the court of appeals held that parties other than a plaintiff's actual

---

[13]    The page references to Doc. 25 correspond with the court's CM/ECF numbering system.

or potential employer could be liable under Title VII <u>if they control the plaintiff's access to employment and deny that access based on unlawful criteria</u>." (emphasis added) (citing *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1342 (D.C. Cir. 1973))); *Zaklama*, 842 F.2d at 295 ("Mt. Sinai was in a position to affect Zaklama's employment in the residency program and did affect his employment with its adverse evaluations.").

However, whether Congress intended for § 12112(a) of ADAA to reach disability discrimination allegedly committed by a covered entity that adversely affected a qualified individual's relationship with his immediate employer is apparently still an open question within the Eleventh Circuit. Nonetheless, even if the court were to determine that only a covered entity that is also an employer or prospective employer of a qualified individual can violate § 12112 of the ADAA,[14] a reasonable jury could conclude that USS's general human resources oversight and its specific exclusive exercise of control over Mr. Chancey's right to return to work made it (and Fairfield) either a single or joint employer of him under the ADAA. *Cf.*

---

[14]  USS's narrow interpretation of the ADAA is seemingly at odds with § 12112(b)(3) which defines "the term 'discriminate against a qualified individual on the basis of disability'" to include "utilizing standards, criteria, or methods of administration -- (A) that have the effect of discrimination on the basis of disability; or (B) that perpetuate the discrimination of others <u>who are subject to common administrative control</u>[.]" 42 U.S.C. § 12112(b)(3) (emphasis added).

*Llampallas v. Mini-Circuits, Lab., Inc.*, 163 F.3d 1236, 1244 (11th Cir. 1998) (noting that single employer and joint employer doctrines under Title VII "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based").

More specifically, the record reflects that during the relevant time frame, Fairfield was a wholly owned subsidiary of Birmingham Southern Railroad Company, which was a wholly owned subsidiary of Transtar, which was a wholly owned subsidiary of USS. (Doc. 25 at 4 ¶ 1). Further, as USS concedes, one of its employees is responsible for human resources functions of Transtar and the companies it owns, including Fairfield. (Doc. 25 at 9 ¶ 36). Thus, USS manages Fairfield's human resources matters.

In fact, Dr. Szabo, a USS employee, is the key decisionmaker who refused to permit Mr. Chancey to return to work based upon her medical evaluation of him and nothing in the record suggests that Fairfield had the right to override Dr. Szabo's employment determination that was adverse to Mr. Chancey. Therefore, because triable issues of fact relating to agency principles exist regarding USS's role as a single or joint employer of Mr. Chancey under the ADAA, the improper party portion of USS's Motion is due to be denied.

### 2.    USS's Other Objections to Mr. Chancey's ADAA Claims Tied to Fairfield's Motion

For the same reasons stated in section IV.A.2.a.-b. above, USS's Motion is due to be granted with respect to its other objections to Mr. Chancey's ADAA counts premised upon Fairfield's Motion.  In short, Mr. Chancey cannot show the element of "qualified individual" in support of his ADAA discrimination claim due to the application of *Cleveland* and the absence of a reasonable explanation behind his incompatible VA disability application and status.

Further, Mr. Chancey cannot pursue his ADAA medical evaluation claim against USS in either the manner alleged in his complaint (but ultimately abandoned by him) or in the refashioned format of a breach in confidentiality claim, as untimely presented in his opposition to summary judgment.

### C.    Evidentiary Motions

### 1.    Defendants' Hood Strike Motion

Defendants' Hood Strike Motion is *Daubert*-based and seeks to exclude the opinion testimony of nurse practitioner, Ms. Hood, concerning Mr. Chancey's ability to return to work on the basis that "she is not qualified as an expert about [Mr. Chancey's] fitness to return to work and because her testimony is not 'based upon sufficient facts or data'" (Doc. 28 at 4 ¶ 12) due to her lack of familiarity with Mr.

Chancey's work environment.  Because the court's merits-based dismissal of Mr. Chancey's ADAA discrimination claim turns upon grounds unrelated to the admissibility of Ms. Hood's testimony, Defendants' Hood Strike Motion is due to be termed as moot.

### 2.    Defendants' Thomas Strike Motion

Defendants' Thomas Strike Motion is similarly *Daubert*-based.  Because the court concludes that Mr. Chancey's ADAA discrimination claim substantively fails regardless of the admissibility of Dr. Thomas's expert opinion testimony about Mr. Chancey's suitability to return to work, Defendants' Thomas Strike Motion is also due to be termed as moot.

## V.    CONCLUSION

As a result of the above rulings, both Fairfield's Motion and USS's Motion are due to be granted in part and denied in part.  Further, the Hood Strike Motion and the Thomas Strike Motion are due to be termed as moot.   Finally, in the absence of any pending claims remaining, the court will enter a separate final judgment order dismissing Mr. Chancey's lawsuit with prejudice.

**DONE** and **ORDERED** this the 12th day of June, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge